Mr. Jacobs, whenever you're ready. Thank you, and may it please the court, I'm Brian Jacobs and I represent appellant Michael Hild here on appeal. This court should reverse Mr. Hild's conviction because the evidence was insufficient to establish that the bonds at issue could not have been sold for the prices that Mr. Hild's company, Live Well, gave to IDC, the pricing service, and the government also failed to prove intent to defraud. At a minimum, the court should order a new trial for several reasons, because the conviction was based on an erroneous right to control instruction that the Supreme Court subsequently invalidated, because Mr. Hild's trial counsel was conflicted and ineffective and the district court applied the wrong standard in assessing that claim, and third, because evidence that has come to light post-trial on multiple fronts would have resulted in an acquittal, namely evidence of the extent of the lenders profits from the bonds at issue, whose values Mr. Hild was accused of misrepresenting, and evidence that a government cooperating witness was involved in the supposedly neutral Bloomberg prices that were used to help establish falsity at trial. I'll take these issues in order, unless the court has a preference otherwise. First, the evidence was insufficient to establish that Mr. Hild misrepresented the bond prices or had intent to defraud. This case is on all fours with this court's recent decision in United States v. Connolly. In Connolly, the evidence failed to show falsity. That is, it failed to show that Deutsche Bank... In Connolly, the question that the BBA asked was, what rates could you, could you charge? And here, it seems like a different question that was, or a different provision of the lender agreement was, what is the market value as determined by the IDC? So the second, this case, seems to have an answer that goes through IDC, that comes from IDC, whereas Connolly seems to be sort of an open-ended, you know, what could you get? And that seems more subject to some variation. I think that the precise question here is, I don't know that it's what is the market price determined by IDC, because IDC's own agreement with the lenders says they can use broker quotes to set forth their value. It's just market value is defined as the price at IDC. And that, and IDC is permitted to use broker quotes, quotes from Livewell. The question, though, is whether it's accurate, whether it's an accurate market price. And the government's position was, well, whatever is the true value of the bonds is not a market price because they could not be sold for the price that IDC is publishing, that it got from Livewell. That is where the failure of proof is. There's no proof that the bonds could not be sold at the prices that IDC is publishing, that it gets from Livewell. Is it part of the fraud that HILD was influencing, Livewell was influencing the IDC price? That is a part of the fraud, but that is a separate part. If there were no question that you could sell the bonds at the price represented, I don't think anybody would care that IDC is using broker quotes from HILD. The issue, the government argues at trial, is that the prices are jacked up and inflated. The issue of... But they thought that they were a market value based on an independent third party. That ties in, that ties in with the right-to-control issue, which Ciminelli has invalidated. So the mere fact that... Well, the question there under Civitelli is, given that he was trying to do this, was this affecting only the investment or was it infecting also loans and therefore real property? And as to some counts, it sounds as though the Civitelli problem is there. As to some others, not. And is it obvious, as in the Civitelli cases we have had, that there was... The jury would have convicted of it? I think that's a hard question. I also hope you will save some time, though, for the question of whether counsel was adequate given a Sullivan problem of being not uninterested in the result or trying to get the wrong result, but so busy with his own case that he didn't do this one. And this, for me, is directly relevant to the Foster-Bloomberg thing because the district court said that there wasn't the kind of diligence that was needed and therefore this doesn't come in. But if for a reason there wasn't the diligence, maybe because of a lawyer who was fighting his own case, that seems to me a problem. So I'd like both sides to address that. For me, the Civitelli issue is one. I frankly am more interested in the other because I don't understand Civitelli. Let me turn to the issue Your Honor raised because I agree that it is a really important issue and the inconsistency, Your Honor, flags between the ruling on ineffective assistance and the ruling on the Foster and Bloomberg evidence, I agree, is entirely inconsistent. So I would say, first, the district court erred in denying Mr. Hill's motion for a new trial because Mr. Hill's counsel suffered from an actual conflict. This is not a case where there was a credible attorney affidavit that said, you know, I hear what the defendants is saying but that didn't influence my strategic judgments. The district court reviewed the 70-some page affidavit Mr. Dusing supplied and did not credit it. She did not credit it. She credited the evidence that Mr. Hill supplied. The idea that Mr. Dusing cut short the trial, did not put on as robust a defense case as he could have, did not call an expert because of the conflicting obligations. She didn't credit the conclusion. She credited the factual underpinnings and so the conclusion is the important part, right? Whether or not any conflict, any concern about the timing overlap and the like caused any deficient performance. Correct, Your Honor. The conclusion is what's important but the problem here is that the standard the district court applied asked whether Mr. Dusing still had an incentive to see Mr. Hill acquitted. But that is not this court's standard. No, but if the question was, did in that situation the lawyer do anything that hampered because of that, frankly, I have little problem with whatever they call Davis or that, the things that the district court looked at. Because as to that, I don't think that they were really that. So my question is, did that affect due diligence which affected the foster and the foster thing, is that relevant enough? So not the things the district court ruled on, their conclusion, because the district court ruled before they knew about the foster and Bloomberg due diligence. Yes, Your Honor, and I think that on the foster diligence point, a couple points on that. I think that we made this claim squarely in our papers to the district court and the district court did not address it in connection with foster and Bloomberg. I think it is entirely consistent with the MALPD standard, a conflict inconsistent with a plausible trial strategy or tactic. One such plausible strategy would have been that when this, what is really Brady information is revealed at the 11th hour, just before the trial, a plausible tactic would have been to do a comprehensive and exhaustive investigation into it, to make the demands on the government. How did you not disclose this when for four years your cooperating witness has been the source of the Bloomberg values and you're only disclosing it for the first time, if you're disclosing it at all in this ambiguous disclosure. Dusing does none of that and the district court did not address that and yet the sole basis for her denial of rule 33 was the idea that counsel didn't exercise diligence and yet the reason why this lawyer was not diligent is because he was fighting these unrelated... So it's not a question of whether he had an interest that was inconsistent with his guise. It wasn't that he wanted to have a conviction or something. The question is was he so busy that he didn't do something that was essential to this trial? I think the rule 33 standard, which does look at diligence, overlaps with the Malpede standard, which asks is the conflicting obligation inconsistent with a plausible strategy or tactic? Do we have any case in which a Sullivan standard has been applied where there wasn't an inconsistency in terms of result but simply in terms of how much work you did? I didn't find any case that you know it may be right but I didn't find any case where we said that. Your Honor, I'm not... And that might be because it really does sound in a Strickland analysis and so lots of kind of well you know he's saying or the government's saying it was a strategic decision but really it was named the cause for the deficient performance and so we analyzed that under Strickland, that kind of conflict under Strickland and not under Sullivan. Presumably we don't have any Sullivan cases like that even though you can imagine all kinds of situations in which lawyers have competing draws on their attention that could be said to cause a deficient performance. I think it's very different here than those cases because I think in the mine run of cases you'll have the lawyer say well that conflicting obligation did not impair my strategic judgment and we'll say that in a credible affidavit and you don't have that here and you'll also have situations where this is not a scheduling obligation, this is the lawyer himself who's facing severe sanctions and jail time and the loss of his child. So I think that it's very different from the mine run of scheduling cases and I think on the diligence question it's really I mean the government makes what I think is a really stunning argument in the brief which is that on page 22 on this in the supplemental brief it should have been obvious to Hill that the pretrial disclosure of this information about Foster was part of the government's effort to comply with its Brady obligations as the disclosure was definitionally not required by 18 U.S.C. 3500. But of course this was produced together with 3500 material and was marked as 3500 and what the government is essentially saying is not contesting its Brady-like character but suggesting that Dusing should have known that this piece of paper marked 3500 is actually Brady and then run it down. So I think that Dusing in that situation really does not exercise the diligence to do that for sure and the idea that Mr. Hill... When did counsel get the 3500? This particular piece of 3500 was produced in the weeks but in a week or two or three before trial. I don't the exact date is in our brief and I'll have it on on rebuttal but essentially the 2,000 pages of 3500 here are produced in the lead-up to trial you know the bulk of its produced on one day. We're not talking about the Friday before Monday trial you're talking you said one two or three I had a month. It's not the Friday before it's not the Friday before but it's shortly before. How important was the Foster-Bloomberg? That is we have to assume if we decide your way in this that that would have affected the jury verdict and I'd like to just address that for a moment of whether this well perhaps clearly wrong was not wasn't that which comes up in a different way if we look at it under Strickland because then it comes up under the second part of Strickland but is relevantly also under Sullivan because if it didn't really matter. Yes your it satisfies either Sullivan or Strickland and was absolutely central to the trial and I think that if the Foster-Bloomberg evidence was introduced Mr. Hilt would have been acquitted because the Bloomberg prices were offered as the neutral valid unquestionable third-party prices for these bonds that show that Mr. Hilt's prices for them and Livewell's prices are fraud and inflated and false. If the if the jury had been told well those Bloomberg prices that's actually a government cooperator who was feeding those to Bloomberg who was that who had previously worked with Mr. Hilt and then got a non-prosecution agreement a promise not to prosecute him and then immediately at the same time you know in 2017 began working to provide pricing to Bloomberg that is a devastating line of argument for defense counsel and I think likely would have resulted in an acquittal. Can I have you go back to because I think I do understand it they spent a lot of time trying to understand it so I mean obviously there's there's an error and so it seemed the question is is the is the harmlessness of it what evidence or or are what evidence let's start with that would you point to that wouldn't also go to the traditional property value theory I mean as I went through it it seems to me if this were tried again without right to control it would look a lot like it did look if not exactly the same in terms of evidence and in terms of argument I've looked for I don't think there was any kind of argument well we don't even need to prove that there was deception as to the value because we've shown you that IDC wasn't independent in that and I don't see any kind of argument like that and I don't see evidence that would go that wouldn't go to the traditional property value can you identify I I think there's both evidence and argument that goes squarely to the right to control theory I think it is throughout the trial and I think if that were stripped away it would be a totally different trial and that we cite some examples starting at page 10 of our reply brief and I'll give both some of the control what I mean when it just be right to control getting money or where the lenders whether the lenders provided the loan no the the way the right to control instruction is delivered in this case and I think judge Abrams has acknowledged that it is it was erroneous is that and I don't have the text of it in front of me but the idea is that you deprive the lenders of the ability to make a discretionary of information necessary to make a discretionary economic decision and the information here that is relevant to that is that live well as providing broker quotes to IDC and so that to get much to get the loans I mean I guess I'm just asking I don't I question is yes you could imagine a scenario in which the government was just trying to prove they thought they were getting independent valuation but in fact live wells feeding it to them and so you know if they'd known that they wouldn't have proceeded and that and that's sort of a pure right to control theory as but if it ties into what they what the valuation was just factually it ties in and it's going to look like all of the same evidence even if you're not pressing right I don't think so because if the prices are not inflated and it's purely the argument is just the lenders wouldn't have lent because Hill was if they'd known Hill was behind IDC that's the right to control argument that's struck and that is the argument didn't the Supreme Court in Chivinelli say that you might have this problem but if it did really go to property then it is okay I mean didn't they while they were deciding that case almost look to a situation like this one and say there may be error but it may not matter the right to control takes the issue of property out it takes the issue of out of the case the government argued in its opening the lenders never would have lent to live well if they'd known live well was behind IDC prices that's at appendix 60 in summation they said mr. Hill was guilty because he didn't tell the lenders that Hild was the one pulling the strings at IDC that regardless of whether the prices are false or accurate or or made in good faith there's evidence at trial all of that would have been relevant to that I don't I don't think so your honor because the the lenders would if the prices were accurate the lenders wouldn't have cared who was behind them and the argument wouldn't have come out and with every lender this evidence was developed what did you care that Hild was behind IDC and they say yes we care deeply and and and that evidence is offered with every single lender and with the cooperating witnesses as well and I don't think any of that evidence comes in the same way it's it's potentially entirely irrelevant the agreement that IDC has with the lenders says that IDC can use broker quotes and the problem is not Hild being behind IDC the problem becomes whether the bond values are false or not. I think the art the defense of trial is that we thought these were market values and we just didn't tell our investment thesis to the market so they didn't we thought this was the intrinsic value and and I suppose and maybe if we had I mean it seems like you're saying if we had told what it was it would have affected the market value but that's like a hypothetical market value not the actual market value. I think you know both of the or the cooperators testify that if we disclosed our thesis to the market about how the intrinsic value makes these bonds more valuable then everyone would have known and the price would have would have gone up and so what it allowed what the right to control issue allowed the government to argue here enabled the government argue is that there really was a fraud solely based on Hild being behind IDC so on the instructions where the right to control is given the three charges there's plain error and on the other two we would argue that there's spillover prejudice under the Rooney case where the government makes pejorative use of this idea that Hild is behind IDC to take the issue of falsity out of the case where the cooperators are saying we had a good faith effort to value the bonds and we knew the market would go up if we disclosed our thesis to the market I'm happy to answer further questions but I know it's I'm over and have time for rebuttal thank you may it please the court my name is Scott Hartman I'm assistant US attorney in the Southern District of New York I represent the government on this appeal and I also represented the government in a trial court below with the court's permission I'd like to start by talking about this Chiminelli or Simonelli issue and the key point I want to emphasize is the point that judge Nathan was just making which is that the theory of this case was that misrepresentations were made to the lenders either directly through the financial statements that live well published and the defendant signed or through IDC about the market price of the bonds and the reliability of those market prices for the lenders in making a risk assessment about whether they would lend money and how much they think it's theoretically possible we can get into I guess in thinking about whether it affected substantial rights what that theoretical possibility looks like but isn't it theoretically possible that the jury convicted here only on a control theory I think judge Nathan it's really hard to imagine that scenario because precisely because of the issue of the lender testimony about the fact that they would not have lent but for their belief about the independence of these prices that went to an assessment of how much money they were going to land how much property was going to be extended to the defendant ultimately the question in Simonelli is whether the government can make an argument about property that is the object of the fraud that is a non-traditional type of property and here in every case the purpose of the fraud the objective with a of the fraud was obtained to attend money there's no question that that is the incentive you know that that's what was going on and there's plenty of evidence the contrary notwithstanding but are you not asking us to put ourselves in the position of the jury and saying all the jury would we are we are asking you to do that judge Calabrese and I would analogize this to the Tusman case which I know you sat on the panel for where there was this precise issue there were two theories there was a traditional property theory and there was also a simonelli theory this is not a situation in which the the fraud or the misrepresentation was something that was orthogonal to the benefit of the bargain this wasn't about the competitiveness of the bidding process or about some sort of policy objective that was not related to the value that the counterparty got I have a small technical question we just got word of another to an LE case before another panel in which the question was really verbally the same one but I take it you would be saying that the question of whether the jury would have convicted in this case anyway is unique to the facts of each case so that one doesn't have to wait for what they do to decide whether this is enough or not in ours judge Calabrese I think that's right I think that's consistent with the way this court does a yates type analysis it's a question of the facts of the particular case and whether the jury inevitably would have arrived at the same conclusion in any event you know to judge Nathan's point there was substantial evidence about the fact that mr. Hilde understood that the market prices for these bonds were much lower than the prices that were being fed to IDC and the prices that were reflected in the financial statements it is not accurate and I want to address the Bloomberg material that we were only relying on that to prove that discrepancy in fact most of what we relied on was mr. Hilde's own statements there were recorded phone calls where he acknowledged the discrepancy there were internal documents at the well that you did all that but in your conclusion you emphasize the Foster Bloomberg things as well judge Calabrese respectfully I don't think that's accurate I think if you go the defense says that in their briefs but I would really encourage the court to look closely at the record read the summations there is no evidence in the record of the Bloomberg price for any particular bond absolutely none there is lots and lots of evidence in the record not even that it was harmless judge that it was immaterial it was not part of our argument our argument was about mr. Hilde's subjective belief about what the market prices were the relevant comparator as we argued it to the jury was what mr. Hilde understood about where these bonds could be sold that was not something that was being dictated by live well don't think it's terribly important to a jury to know that something which was viewed as an objective outside price that showed that this guy was cheating not just that he intended to cheat but he was actually cheating was actually wrong and alive judge that that may be true but we did not put that evidence before the jury there is there is not evidence of what the Bloomberg prices was there was very limited testimony about the Bloomberg marks and it was very high level and what it went to or the context in which it came up was there were a couple of witnesses who said they looked at the Bloomberg prices and noticed a discrepancy and that then led them to ask questions and raise concerns and the one that gets emphasized most in the defense brief is mr. Haddock who came in as the CFO after Eric Rohr left the company Eric Rohr was one of the conspirators and what he said in his testimony is he looked at the Bloomberg valuations there were lower and he then undertook his own investigation to see if the live well prices could be he ultimately concluded they weren't justifiable based on his own analysis and then he refused to sign the financial statements and he resigned from the company and so that's the context in which this information came up we did not for example as we could have put in the Bloomberg marks for these particular bonds and say look where live well had the marked look where Bloomberg had the marked this is how you know these valuations are accurate what we said instead were things like this is where live well purchased the bonds and then this is where they immediately marked them and it's substantially different we showed things like mr. Hill on phone calls saying we can't allow the banks to find out that we're behind the IDC prices there any comparison of purchase actual purchase price to the Bloomberg mark no your honor there wasn't what we did have is we had comparison of purchase price to the marks that live well provided to IDC well that's exactly our point is that's the inflation the question for the purposes of the IDC marks and also for the purposes of the financial statements was where would the bond transact as of the date of the acquisition and so the best indicator of value for that purpose is a market price where you bought the bond and so it was a relevant fact for us to argue to the jury that live well couldn't reasonably have believed that they could buy a bond on day one and turn around and sell it for 40 40 percent higher and that was the argument that we were making let me tell you what I've got to struggle with I think you are in a way arguing to us there's plenty of evidence that this guy's guilty of sin and you were you or you deciding would decide that way but I worry whether a vote of a chiminelli and of the other you are asking us to take the place of the jury and that's what I got a struggle I'm the first I got a little problem but what I judge our view would be it's the burden of the defense to show that the the error would have affected the outcome that because we're under plain air that's correct you can see the plainness absolutely that's right you know the law is that if the law changes after the trial then there's plain air the question is affecting substantial rights which I mean it tell me how you understand what what we should be doing in that but it is this analysis it's not it is a sort of substitution or at least an evaluation based on all of the evidence and all of the argument whether we conclude that the jury very likely did convict on a proper basis that's exactly right judge Nathan this is the court does in every plain error case and in every Yates case that's that's the issue it was the issue in Tusman and respectfully I submit if you look at the record there's no circumstance in which the jury could have concluded that this information was not a make a broader argument of a variety of errors are we supposed to consider the possibility but you tell me and the possibility of a together and say that together they give us enough though we very rarely do that yeah judge Calabrese I want to I want to be sure I'm answering your question which I take to be really about the ineffectiveness question so there's two points I want to make about that or actually three the first is that with respect to the standard whether we use the the actual conflict standard or the standard judge Abrams did do an analysis under both prongs and made findings based on yeah but without the question of due diligence before her which seems to me to be the key the ladies if there weren't due diligence I'd have no problems with Davis and so it is nothing okay when we then learn that because of diligence this doesn't come in then everything she did was really not so judge Calabrese I hear you focusing on the Bloomberg material so that's that's something I want to address so the Bloomberg material was disclosed on March 19th of 2021 which is about a month before the trial the order that creates in the defense's view the conflict the custody order is April 15th of 2021 so the conflict does not arise the conflict that is giving rise to this concern does not actually arise until well after this information is disclosed so to the extent there's some concern that that impacted that's right the actual production was quite small there were a number of pretrial disclosures but this was prior witness statements for a government cooperator the type of information that trial counsel would necessarily focus on if you're asking the question of whether a lawyer and his path are already so much involved in other things that they are not doing the job that somebody has a right to have their lawyer do and because of that you know a month or so has not done the due diligence on the basis of which then the court says this doesn't come in so judge Calabrese I think the way you'd analyze that I think you have to analyze it under Strickland because the the conflict that is being raised with respect to the scheduling is one that arises later and when you look at it the question is would it have affected the outcome of the proceeding and the answer to that is no for a couple of reasons one as I said before the government did not in any meaningful sense rely on the Bloomberg evidence and to the extent there was Bloomberg evidence put before the jury there was lots and lots of other evidence. I am not sure that this comes up under Strickland because it almost never has been which is why we don't have a Sullivan case where the problem is the guy was too busy and then a decision of due diligence almost always there is a conflict of another sort but my question is when the conflict is of this sort shouldn't we look at it in terms of what Sullivan is about which says was the person conflicted in something that they did and here it is a matter of timing now I know there are no cases. Well well I think that's right and Judge Abrams does say you know the court in a very restrictive number of the rule is that is that is typically how this court analyzes conflicts of interest by attorneys. There are a very narrow class of cases typically very severe conflicts where the attorney is a defendant in a criminal case or likely to be charged or likely to be charged when the case is over where this court has recognized the categorical exception where you don't engage in a Strickland type prejudice analysis. If you start saying defendants have an incentive to go back and investigate the personal lives of their lawyers because then they can dispense with I think you should really be concerned about opening the floodgates here. The other points that I want to make Judge Calabresi because I want to address address your point is there does have to be a link a causal link between the conflict and the strategy that wasn't pursued. Even under the more restrictive standard there has to be a causal link. You don't have to show that it would have been outcome determinative but there has to be a connection and here there's no proof in the record that the scheduling conflict is the reason this Bloomberg evidence wasn't pursued. And in fact I think the more likely understanding of why it wasn't pursued is what I was saying earlier which is that the Bloomberg evidence did not feature prominently in the trial. It wasn't a big part of the case. And in fact the theory on which Mr. Foster's potential motive to influence the Bloomberg evidence somehow affects the jury's perception of the reliability of that information is very very attenuated. The record is that Bloomberg isn't doing their own analysis. Mr. Foster's inputs are one of them but he is not in any sense I don't think there's any suggestion in the record to the contrary dictating what these Bloomberg numbers are. And there's certainly no indication that you can make a persuasive argument to the jury that those numbers were the effect of Mr. Foster trying to curry favor with the government or something like that. Thank you. Can I just walk back to Triminelli for one more point because you said it a couple of times and I just want to make sure your argument doesn't strike me as necessarily the case. When I think about the distinction here between right to control theory and traditional property, here's two conceptions. Tell me if I'm right. Traditional property theory would be HILD deceived lenders as to the value of his collateral to secure loans and so deprive them of their money, right? Yes. Traditional. That's correct. Second way of thinking of it, HILD deceived lenders as to IDC's independence and so deprive them of their ability to make an informed economic decision about what to do with their money. That's a right to control theory. So can I address that second point? Do you agree that it's a right as articulated? Phrased as you phrase it, Judge, I agree. Right. So then the question of could the jury, is it possible, and again, that doesn't resolve the harmlessness question, but is it possible for the jury to have convicted on that, a version of that articulation of the right to control theory? The instruction was given to the jury. So that theory was before the jury. We're not fighting that at all. You know, the plain error standard, the question is, would it have been likely to affect the outcome? And the answer, Judge, that I want to give you on this point is the relevance of IDC's independence doesn't just go to an intangible property right of a right to make informed economics. I get that. So I'm fully on board with it. It goes to both. And as you heard me say, if this were tried again under just a traditional property theory, I think it would probably look a lot like this. That's a different question, I think, than could the jury theoretically, on this evidence and with this instruction, have convicted just on the right to control theory? And it seems to me theoretically possible. Judge, anything is theoretically possible? Well, OK. I think because the instruction was given to the jury, it's certainly possible that this was a theory that they relied on. But my answer to your. It could have been the instruction that they're given. And yet, as a logical matter, to reach the conclusion on the right to control theory, they would have had to also conclude traditional property value theory. And I think I'm chafing against that assumption. So I think what I would say is in this case, it comes back to what I was saying before, which is that this is not a representation that was orthogonal to the benefit of the bargain. The cases where right to control is problematic, where I think you have a real Yates concern, is where there can be some argument that in the absence of the misrepresentation, or sorry, that even with the misrepresentation, the counterparty still got the benefit of their bargain. You know, I was talking about cases where there's some sort of policy initiative that the counterparty is lying about. Here, the issue of independence was core to how much money the banks were going to extend to Mr. Hilde and Livewell because they wanted to understand that these were prices that they could turn around and sell into the market. And they, for example, many of these loans had a haircut, so they would take the market price and reduce how much they would lend in order to guard against the risk that the market price that they were getting was too high or one that they couldn't obtain in the market. And so the testimony about the lenders and the relevance of this went directly to, or the independence of these prices, went directly to their assessment of how much credit to extend to Livewell. And I think that's the point I'm trying to make, Judge Nathan, is that it's core to the bargain. Sorry, Judge Kelley. What you're saying, is it more than plausible that they could have convicted on something that stands under chivadelli? And there's no doubt it's more than plausible. My question is, is that what we do or do we look to the fact that they could have? And you've made the argument, why? Well, what I'm really trying to do is lean into the point that Judge Nathan's making and say, I do think it's the case that you can't have a right to control theory that doesn't also implicate property in this particular case, that you have to come to the property conclusion because of the way these facts came out. But I disagree with you, and I think there's some sunlight for a possibility that the jury only relied on right to control. How would you apply the affecting substantial rights test? I think the question is, would the jury have likely come to a different conclusion if the instruction hadn't been given? And the answer to that is no. There was overwhelming evidence that Mr. Hilde understood that these valuations were not valuations for which he could obtain market transactions. And that was very much a part of the government's presentation of the evidence. We did make these arguments about independence, but there really was crushing proof of that issue, including, as I said, these recorded calls, Livewell's own internal documents. There was a lot of proof on that point. I think the jury understood that. We'll hear about them. Thank you, and may it please the court, I want to respond to a number of arguments Mr. Hartman made. First, supplemental appendix 52, the government submitted a letter to the district court on the diligence issues and wrote, the government's key contention at trial was that Hilde defrauded the lenders by leading them to believe that the prices they were using to value their collateral were, quote, an independent third party's valuation of the price for which the bonds could be sold, when in fact Hilde knew they were not. So the right to control is characterized by the government itself as the key contention at trial. And as to whether it affects substantial rights, I think it clearly does. I would cite the U.S. v. Balde case, B-A-L-D-E-943-F-3-73, because it led the jury to convict Mr. Hilde of conduct that's not criminal. As to Mr. Hartman's arguments that Bloomberg was a non-issue at trial and not mention the government didn't introduce it, it's just not true. Appendix 602, Mr. Hartman in his summation argued to the jury, he was explaining a call that Mr. Hilde was on and said, we looked and we found on Bloomberg, this is the lender, we looked and we found on Bloomberg there's other prices for these bonds and they are a lot lower than what's in IDC. Do you have any idea why that is? And we recite on pages seven to nine of our supplemental reply brief, extensive evidence and argumentation about the Bloomberg values. And even when Bloomberg is not specifically mentioned, it was the only evidence of the market value. And even though there were no quotes- Why wasn't the purchase value evidence of the market value? Because the purchase price, I mean, it's an investment and the investment is certainly going to, the value of it is certainly going to change and what the lender witnesses say is not, you know, we look at the purchase price and it went up. Maybe now they do, I don't know. What they say is they look at Bloomberg and the prices on Bloomberg are lower. That's what they say. And they don't say this is how much lower they are, this is the number on Bloomberg, but Bloomberg is clearly the referent, it is the referent in the record. On the conflict issue, Mr. Hartman suggested it arose in April, not in March a couple weeks earlier. That's just not so in the record where we litigated ineffective assistance at great length. In the district court, we highlighted how the conflicting litigation dated back many months, all the way to February where there was a trial in front of the Kentucky court and there were extensive proceedings. And the opinion in April was one of many culminations of that. The proceedings continued on for years afterwards. As Judge Calabresi observed, this is not, I think, a Strickland case. This is a straightforward application of Sullivan and it's not at any risk of opening the floodgates. This is a very rare case where we have a 76 page affidavit with dozens of misstatements in it, to put it charitably, that the district court itself declined to credit, despite the government urging the district court to credit it. And then last, I would just say that this is a case where even if viewing any of these issues individually raises issues, certainly the cumulative prejudice of the many issues we've raised warrants a new trial here. There is no way a neutral observer could look at this and say that the fairness and integrity of these proceedings were such that the conviction should stand. Unless the panel has other questions, we'll rest on our papers. Thank you. Thank you, counsel. Thank you both. Thank you. We'll take the case under address. We'll argue without going to trial. Thank you. Thank you, your honor.